## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | | |
|---|---|---|
| PATRICK DUNN, | ) | |
|     **Plaintiff,** | ) | CIVIL ACTION NO. |
| | ) | |
| **v.** | ) | |
| | ) | |
| GT PROPERTIES, L.L.C., | ) | _____ |
| and LIVE BAIT, L.L.C., | ) | |
|     **Defendants.** | ) | |

## COMPLAINT

## I.    INTRODUCTION

Plaintiff, Patrick Dunn, files this Title III, ADA action, pursuant to 42 U.S.C. §12181, et. seq. In Count One of the Complaint, Plaintiff seeks to enjoin the Defendants to remove architectural barriers. In Count Two, Plaintiff seeks to enjoin Defendants to maintain practices, policies, and procedures necessary to maintain the premises free of architectural barriers both now and once the barriers are removed. In Count Three, Plaintiff seeks to enjoin the Defendants' use of the premises to provide full and equal enjoyment of the premises to the disabled. Counts Two and Three seek independent relief in addition to the removal of architectural barriers. Count Four seeks to enjoin Defendants' failure to design and construct the facility to be readily accessible to and usable by individuals with disabilities.

## JURISDICTION, PARTIES, AND ARTICLE III STANDING

1. Because this is an action for declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act, 42 U.S.C. §12181, et. seq., (hereinafter referred to as the "ADA") and its implementing regulations, this Court is vested with original jurisdiction under 28 U.S.C. §1331 and §1343.

2. Venue is proper in this Court, the United States District Court for the Southern District of Alabama pursuant to Title 28, U.S.C. §1391 and the Local Rules of the United States District Court for the Southern District of Alabama.

3. Plaintiff, Patrick Dunn, was involved in an automobile accident that caused permanent damage to his C-7 vertebra in his spinal cord. As a result, he became paralyzed, which has permanently confined him to a wheelchair. The extent of Mr. Dunn's physical problems limits his ability to care for himself, perform manual tasks, walk, stand, lift, bend, and work, all of which are major life activities pursuant to 42 U.S.C. § 12102 (2) (A). Mr. Dunn is, accordingly, disabled pursuant to the Americans with Disabilities Act, in that he suffers a

physical impairment substantially limiting one or more major life activities. 42 U.S.C. § 12102; See also, 28 C.F.R. § 36.104.

4. Defendant, GT Properties, L.L.C., (hereinafter "GT") is conducting business within the State of Alabama sufficient to create both general and specific in personam jurisdiction. Upon information and belief from the property records on the Baldwin County Geographical Information System, GT Properties, LLC, "owns" and "leases to" Live Bait, L.L.C., the real property and its improvements located at 24281 Perdido Beach Blvd., Orange Beach, AL 36561. The restaurant is a place of public accommodation pursuant to 42 U.S.C. § 12181(7).

5. Defendant, Live Bait, L.L.C., (hereinafter "Live Bait"), is a limited liability company that is both registered to conduct business and is conducting business within the State of Alabama sufficient to create both general and specific in personam jurisdiction. Upon information and belief, Live Bait, L.L.C., "operates" and "leases" the Live Bait restaurant located at 24281 Perdido Beach Blvd, Orange Beach, AL 36561. 42 U.S.C. § 12182. Live Bait restaurant is a commercial facility in that the unit is intended for nonresidential

use and affects commerce. 42 U.S.C. § 12181(2)((A). Moreover, the restaurant provides seafood, steaks, Po'boys, and a range of food, which includes adult beverages on the tiki deck and live music and entertainment in the night club to the public, which qualifies Live Bait as a place of public accommodation pursuant to 42 U.S.C. § 12181(7).

6. All events giving rise to this lawsuit occurred in the Southern District of Alabama and the Defendants is a citizen thereof.

7. Plaintiff, Patrick Dunn travels to Orange Beach at least once a year for a week and often more than that. He lives in Andalusia, Alabama, approximately 115 miles from Orange Beach, which is a vacation and entertainment destination. Mr. Dunn enjoys the social activities and entertainment whether it is going to the beach or going to a bar with friends and family. At least once a year Mr. Dunn goes to Phoenix West II with his son and stays a week; Phoenix West II is less than a mile from Live Bait. Mr. Dunn enjoys going to the Live Bait establishment, which is subject to this action. Mr. Dunn specifically enjoys dining at the Live Bait restaurant for its seafood and live entertainment and has gone there in 2016 and 2017. Mr.

Dunn intends to continue going to Live Bait because he wants to enjoy the seafood, steaks, Po'boys, and a range of food, which includes adult beverages on the tiki deck and live music and entertainment in the night club in the same way that non-disabled individuals enjoy the establishment. Mr. Dunn will return not only to eat, drink and watch the live entertainment at Live Bait, but also to confirm compliance with the ADA by Live Bait. Mr. Dunn does not know exactly when he will go back to Live Bait, because he has not planned out every dining trip for the rest of his life. Such specific planning is not necessary to invoke the ADA. See, e.g. *Parr v. L & L Drive Inn Restaurant* 96 F. Supp.2d 1065, 1079 (D. Haw 2000) and *Segal v. Rickey's Restaurant and Lounge, Inc*. No. 11-61766-cn, (S.D. Fla 2012) ("*Specification as to date and time of return to this public accommodation is impossible due to the nature of the event. Fast food patrons visit such restaurants at the spur of the moment*".). Mr. Dunn definitely intends to return to Live Bait, even after all ADA Title III violations are remediated.

8. Because of the barriers described below in paragraph 20 and throughout the Complaint, Plaintiff has been denied full and equal enjoyment of the Defendants' premises on the basis of his

disabilities.

9. Plaintiff accordingly, has Article III standing to pursue this case because (1) he is disabled, pursuant to the statutory and regulatory definition; (2) the Defendants' restaurant is a place of public accommodation, pursuant to the statutory and regulatory definition; (3) he has suffered a concrete and particularized injury by being denied access to the establishment by architectural barriers, by being denied access by the Defendants' practices described throughout this Complaint, and by Defendants' denial of the use of the establishment for his full and equal enjoyment as the able-bodied, as described throughout the Complaint, and (4) because of these injuries there exists a genuine threat of imminent future injury, as described in paragraph 18.

## II.   PLAINTIFF'S CLAIMS

**ADA, Title III**

10. On or about July 26, 1990, Congress enacted Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12181 et.seq. Commercial enterprises were provided one and a half years from enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992. (42

U.S.C. §12181; 20 C.F.R. §36.508 (A); *See also*, § 36.304).

11. Pursuant to 42 U.S.C. § 12181(7) and 28 C.F.R. § 36.104, the Defendants' establishment is a place of public accommodation in that it is a restaurant providing seafood, steaks, Po'boys, among other coastal food choices, which includes adult beverages at the tiki deck and live music and entertainment in the night club to the public. Accordingly, it is covered by the ADA and must comply with the Act.

## COUNT ONE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12182(b)(2)(A)(iv)
### *(Architectural Barriers)*

**Defendants' Existing Facility Is Subject to the 2010 ADA Design Standards for the Portions of the Facility Addressed in This Complaint**

12. Plaintiff is informed and believes based on publicly available information that the establishment in which the Live Bait restaurant located at 24281 Perdido Beach Blvd, Orange Beach, AL 36561, is located was originally constructed in 2003 with alterations and/or improvements made to the establishment on or after March 20, 2012.

13. The ADA was enacted requiring that facilities constructed prior to

January 26, 1992, are considered an "existing" "facility, such that those facilities must remove architectural barriers where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv). All "alterations" made to existing facilities after January 26, 1992, and all "new construction" after January 26, 1993, must be *readily accessible to and usable by individuals with disabilities*, including *individuals who use wheelchairs*. 42 U.S.C. § 12183(a) and (b). 28 *C.F.R.* § 36.402. "Readily accessible to and usable by. . ." is the "new construction" standard, which requires compliance with the Department of Justice standards. 42 U.S.C. § 12183(a)(1); 28 *C.F.R.* § 36.406. The only defense for failing to provide readily accessible and usable buildings constructed under the "new construction" standards is if the design and construction of the building to be readily accessible and usable is "structurally impracticable". 42 U.S.C. § 12183(a)(1). The "structural impracticability" defense applies only in rare circumstances of extraordinary terrain. 28 *C.F.R.* § 36.401(c). "Readily accessible to and usable by. . ." is also the "alterations" standard. 42 U.S.C. § 12183(a)(2). "Alterations" must be made to the maximum extent feasible. 42 U.S.C. § 12183(a)(2); 28 *C.F.R.* § 36.402. An alteration is a change to a place of public accommodation

or commercial facility that affects or could affect the usability of the facility or any part thereof. 28 *C.F.R.* § 36.402(b).

14. New construction and alterations must comply with either the Justice Department's 1991 Standards for Accessible Design, or the 2010 Standards for Accessible Design. 28 *C.F.R.* § 36.406 establishes whether the 1991 Standards for Accessible Design or 2010 Standards for Accessible Design apply: New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010. 28 *C.F.R.* § 36.406(a)(1). New construction and alterations subject to §§ 36.401 or 36.402 shall comply either with the 1991 Standards or with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after September 15, 2010, and before March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after September 15, 2010,

and before March 15, 2012. 28 *C.F.R.* § 36.406(a)(2). New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after March 15, 2012. *Where the facility does not comply with the 1991 Standards, the 2010 Standards are applicable.* See 28 C.F.R. § 36.406(5)(ii) which states, "Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards."

15. For the architectural barriers at issue in this case, the 2010 Standards for Accessible Design are applicable.

## Plaintiff's Concrete and Particularized Standing to Pursue an Injunction

16. The Defendants have discriminated, and continue to discriminate, against Plaintiff, and others who are similarly situated, by denying

full and equal access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and/or accommodations at the Live Bait restaurant in derogation of 42 U.S.C. § 12101 et. seq., and as prohibited by 42 U.S.C. § 12182 et-seq. As "new construction", the building must be readily accessible to and usable by individuals with disabilities. 42 U.S.C. § 12183 (a) and (b). Defendants' failure to remove the existing barriers thus violates 42 U.S.C. § 12182(b)(2)(A)(iv), which requires removal of architectural barriers.

17. As described above, prior to the filing of this lawsuit, Plaintiff was denied full and safe access to all of the benefits, accommodations and services offered to individuals without disabilities within and about the Defendants' facility. Plaintiff's access was inhibited by each of the described architectural barriers detailed in this Complaint which remain at the facility in violation of the ADA. Because of the foregoing, Plaintiff has suffered an injury-in-fact in precisely the manner and form that the ADA was enacted to guard against.

18. Plaintiff has definite plans to return to the Live Bait restaurant in the future, as described in paragraph 7. Plaintiff will return to Live Bait within the next few months not only to dine and enjoy the seafood, steaks, Po'boys, among other coastal food choices, which includes adult beverages at the tiki deck and live music and entertainment in the night club, but also to see if Live Bait has repaired the barriers, and changed its practices and procedures. Plaintiff will continue to do so in the near future and even when the Live Bait restaurant is repaired. Absent remedial action by Defendants, Plaintiff will continue to encounter the architectural barriers, and the discriminatory policies, practices, and procedures described herein and as a result, be discriminated against by Defendants on the basis of his disabilities. The Eleventh Circuit, held in *Houston v. Marod Supermarkets*, 733 F.3d 1323 (11th Cir. 2013), that when architectural barriers have not been remedied *"there is a 100% likelihood that plaintiff... will suffer the alleged injury again when he returns to the store."* Additionally, *"[A]n alleged constitutional infringement will often alone constitute irreparable harm." United States v. Arizona*, 2011 WL Case 1:11-cv-01804-TWT at *19; see also *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271-72 (11th Cir.

2006) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (*finding "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."*)) Due to the definiteness of Plaintiff's future plans to continue visiting the subject facility, his past patronage, and his travel near the Defendant's restaurant, there exists a genuine threat of imminent future injury, *Houston v. Marod, supra.* Plaintiff's stated intent to return is plausible, as pleaded above. *Houston, supra.*

## Architectural Barriers

19. Pursuant to the mandates of 42 U.S.C. § 12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the requirements of the ADA. 28 C.F.R. Part 36.

20. Plaintiff has been from the parking lot, to the entrance, to and throughout the gift shop; from the hostess counter, to the dining area; from the bar area to the restroom, the restrooms themselves, throughout circulation paths and accessible routes, and service areas, paths of travel, and in particular but not limited to all of which is more specifically described below. Defendants' facility located at

24281 Perdido Beach Blvd, Orange Beach, AL 36561, more commonly known as "Live Bait", violates the ADA in particular but not limited to:

## PARKING LOT

a) Live Bait provides parking spaces for able-bodied individuals, but fails to provide an ADA accessible parking area for non-able-bodied individuals, which includes but is not limited to the following failures of Defendants:

    i. The purported accessible parking spaces fail to have an access aisle that connects to an accessible route to the entrance of restaurant;

    ii. The parking spaces and their non-existing adjacent access aisles fail to be properly marked so as to be discouraged from parking in them;

    iii. The existing parking spaces fail to have ADA compliant adjacent access aisles;

    iv. Live Bait fails to have and otherwise fails to evenly disburse the accessible parking spaces throughout the parking structure;

v.   There are no accessible parking spaces located at the shortest accessible route to the entrance;

vi.  The signage displaying the international symbol of accessibility designating the right parking space as ADA accessible is measured 39.91 inches above the finished floor which fails to meet the minimum required height of 60 inches above the finished floor;

vii. Live Bait fails to maintain its parking spaces so that they are readily accessible to and usable by individuals with disabilities;

b)  Live Bait provides parking spaces in the parking area for able-bodied individuals, but fails to provide any ADA van accessible parking spaces for non-able-bodied individuals who drive mobility vans which includes but is not limited to the following failures by Defendants:

i.  There are no "van" accessible parking spaces that measure 132 inches wide with a 60-inch-wide adjacent access aisle, or alternatively measure 96 inches wide with a 96 inch wide adjacent access aisle;

ii.  There are no van accessible parking spaces with adjacent access aisles that connect to an accessible route to the entrance of restaurant;

iii.  There is no signage designating the van accessible parking spaces as "van accessible" that is mounted 60 inches maximum above the finished floor or ground surface;

iv.  Live Bait fails to have and otherwise fails to evenly disburse the van accessible parking spaces throughout the parking structure;

v.  There are no van accessible parking spaces located at the shortest accessible route to the entrance;

vi.  Live Bait fails to maintain its parking spaces so that they are readily accessible to and usable by individuals with disabilities;

## ACCESSIBLE ROUTE TO FRONT ENTRANCE

c)  Live Bait provides an accessible route to the front entrance of the restaurant for able-bodied individuals, but fails to provide an ADA accessible route to the front entrance of the restaurant for

individuals with disabilities which prohibits individuals with disabilities from the full and equal opportunity to access the goods and services at the Live Bait restaurant:

i. The facility provides an accessible route to the front entrance of the restaurant for able-bodied individuals but fails to provide an ADA accessible route to the front entrance of the restaurant for individuals with disabilities which prohibits disabled individuals from being able to have the same dining experiences as individuals without disabilities;

ii. The facility provides a path of travel to the front entrance of the restaurant for able-bodied individuals, but fails to provide an ADA accessible route to the front entrance of the restaurant for non-able-bodied individuals;

iii. Live Bait fails to maintain the accessible features of the accessible route to the front entrance of the restaurant so that it is readily accessible to and usable by individuals with disabilities;

**d)** Live Bait provides a route to the front entrance of the restaurant for able-bodied individuals but fails to provide an ADA accessible ramp to the front entrance of the facility for non-able-bodied individuals, and therefore affords individuals with disabilities the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

    **i.** The transition from the landing to the base of the ramp has a change in level other than the slope of the ramp run;

    **ii.** The purported handrails fail to extend 12 inches minimum beyond the top and bottom of the ramp run;

    **iii.** The purported handrails serving the ramp provide squared cross sections that fail to comply with the ADA standards for accessible design;

    **iv.** The gripping surface on the handrail including the surface adjacent to the handrail fails to be free of sharp or abrasive elements with round edges;

    **v.** The purported handrails serving the ramp fail to provide a gripping surface that remains free and clear of any obstructions for a minimum of 1.5 inches below the bottom gripping surface of the handrail;

    **vi.** The purported handrails serving the ramp fail to provide a minimum of 1.5-inch clearance between the gripping surface and the adjacent surfaces;

    **vii.** Live Bait fails to maintain its ramp to the front entrance so that they are readily accessible to and usable by individuals with disabilities;

**e)** Live Bait provides stairs to the front entrance of the facility for able-bodied individuals but fails to provide an ADA accessible stairs to the front entrance of the facility for non-able-bodied individuals, and therefore affords individuals with disabilities the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

  i. The handrails serving the stairs fail to extend 12 inches minimum beyond the top and bottom of the stairs;

  ii. The handrails serving the stairs provide squared cross sections that fail to comply with the ADA standards for accessible design;

  iii. The gripping surface on the handrail including the surface adjacent to the handrail fails to be free of sharp or abrasive elements with round edges;

  iv. Handrail gripping surfaces and any surfaces adjacent to them shall be free of sharp or abrasive elements and shall have rounded edges;

  v. Live Bait fails to maintain its stairs to the front entrance so that they are readily accessible to and usable by individuals with disabilities;

f) The front entrance floor mats are not stable, firm, or otherwise secured to the floor;

## ACCESSIBLE ROUTE TO BACK ENTRANCE

g)  Live Bait provides an accessible route to the back entrance of the restaurant for able-bodied individuals, but fails to provide an ADA accessible route to the back entrance of the restaurant for individuals with disabilities which prohibits individuals with disabilities from the full and equal opportunity to access the goods and services at the Live Bait restaurant:

i.  The facility provides an accessible route to the back entrance of the restaurant for able-bodied individuals but fails to provide an ADA accessible route to the back entrance of the restaurant for individuals with disabilities which prohibits disabled individuals from being able to have the same dining experiences as individuals without disabilities;

ii.  The facility provides a path of travel to the back entrance of the restaurant for able-bodied individuals, but fails to provide an ADA accessible route to the back entrance of the restaurant for non-able-bodied individuals;

      iii. Live Bait fails to maintain the accessible features of the accessible route to the back entrance of the restaurant so that it is readily accessible to and usable by individuals with disabilities;

h) Live Bait provides a route to the back entrance of the restaurant for able-bodied individuals but fails to provide an ADA accessible ramp to the back entrance of the facility for non-able-bodied individuals, and therefore affords individuals with disabilities the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

      i. The transition from the landing to the base of the ramp has a change in level other than the slope of the ramp run;

      ii. The running slope of the ramp run to the back entrance exceeds the maximum allowed slope of 4.76 degrees;

      iii. The purported handrails fail to extend 12 inches minimum beyond the top and bottom of the ramp run;

iv.  The purported handrails serving the ramp provide squared cross sections that fail to comply with the ADA standards for accessible design;

v.  The gripping surface on the handrail including the surface adjacent to the handrail fails to be free of sharp or abrasive elements with round edges;

vi.  The purported handrails serving the ramp fail to provide a gripping surface that remains free and clear of any obstructions for a minimum of 1.5 inches below the bottom gripping surface of the handrail;

vii.  The purported handrails serving the ramp fail to provide a minimum of 1.5-inch clearance between the gripping surface and the adjacent surfaces;

viii.  The ramp run landing at the top of the ramp fails to provide a 60x60 inches minimum level landing;

ix.  The walking surface on the accessible route leading to the back entrance has a ground surface with openings that are going parallel to the dominant direction of travel which fails to be perpendicular to the direction of

travel as required by the ADA standards for accessible design;

    **x.** Live Bait fails to maintain its ramp to the back entrance so that they are readily accessible to and usable by individuals with disabilities;

**i)** Live Bait provides stairs to the back entrance of the facility for able-bodied individuals but fails to provide an ADA accessible stairs to the back entrance of the facility for non-able-bodied individuals, and therefore affords individuals with disabilities the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

    **i.** The handrails serving the stairs fail to extend 12 inches minimum beyond the top and bottom of the stairs;

    **ii.** The handrails serving the stairs provide squared cross sections that fail to comply with the ADA standards for accessible design;

     **iii.** The gripping surface on the handrail including the surface adjacent to the handrail fails to be free of sharp or abrasive elements with round edges;

     **iv.** Handrail gripping surfaces and any surfaces adjacent to them shall be free of sharp or abrasive elements and shall have rounded edges;

     **v.** Live Bait fails to maintain its stairs to the back entrance so that they are readily accessible to and usable by individuals with disabilities;

## HOSTESS COUNTER

     **j)** Live Bait provides a hostess counter for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from, a good, service, facility, privilege, advantage, or accommodation that is equal to the experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

     **A.** The hostess counter fails to provide a minimum of 36 inches of clear counter surface for individuals with

disabilities to be able to make a parallel approach to the counter;

    **i.**    There is not 36 inches of clear counter surface that is measured a maximum of 36 inches above the finished floor;

    **ii.**    There is not clear floor space that is at least 48 inches long x 30 inches wide provided adjacent to the 36-inch minimum length of counter;

**B.** The existing hostess counter fails to provide a minimum of 30 inches of clear counter surface for individuals with disabilities to be able to make a forward approach to the counter;

    **i.**    There is not 30 inches of clear counter surface that is measured a maximum of 36 inches above the finished floor positioned for a forward approach;

    **ii.**    There is no knee and toe clearance provided under the 30 inches of clear counter surface

that is measured a maximum of 36 inches above the finished floor positioned for a forward approach;

iii. There is no clear floor space that is at least 30 inches wide x 48 inches long provided underneath the 30 inches of clear counter surface that is measured a maximum of 36 inches above the finished floor positioned for a forward approach;

C. There is no ADA accessible portion of the hostess counter that extends the same depth as the non-accessible portion of the hostess counter;

D. Live Bait fails to maintain the accessible features at the hostess counter that are required to be readily accessible to and usable by individuals with disabilities;

## GIFT SHOP SERVICE COUNTER

k) Live Bait provides a sales/service counter for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from, a good,

service, facility, privilege, advantage, or accommodation that is equal to the experience afforded to individuals without disabilities, which includes but is not limited to the following failures of Defendants:

**B.** The sales/service counter fails to provide a minimum of 36 inches of clear counter surface for individuals with disabilities to be able to make a parallel approach to the counter;

    **i.** There is not 36 inches of clear counter surface that is measured a maximum of 36 inches above the finished floor;

    **ii.** There is not clear floor space that is at least 48 inches long x 30 inches wide provided adjacent to the 36-inch minimum length of counter;

**C.** The existing sales/service counter fails to provide a minimum of 30 inches of clear counter surface for individuals with disabilities to be able to make a forward approach to the counter;

     **i.**    There is not 30 inches of clear counter surface that is measured a maximum of 36 inches above the finished floor positioned for a forward approach;

     **ii.**    There is no knee and toe clearance provided under the 30 inches of clear counter surface that is measured a maximum of 36 inches above the finished floor positioned for a forward approach;

     **iii.**    There is no clear floor space that is at least 30 inches wide x 48 inches long provided underneath the 30 inches of clear counter surface that is measured a maximum of 36 inches above the finished floor positioned for a forward approach;

**D.** There is no ADA accessible portion of the sales/service counter that extends the same depth as the non-accessible portion of the sales/service counter;

E. There is no ADA accessible check writing surface provided 28 inches minimum and 34 inches maximum above the finished floor that allows for the required knee and toe clearance;

F. Live Bait provides a point of sale machine to transact business at the sales/service counter for able-bodied individuals, but fails to provide the same level of service to non-able-bodied individuals by providing a point of sale machine at an accessible portion of the counter;

G. The current practice at Live Bait is to place items within the required clear counter surface;

H. Live Bait fails to maintain the accessible features at the sales/service counter that are required to be readily accessible to and usable by individuals with disabilities;

## BAR DINING AREA

1) Live Bait provides an accessible route to the bar dining area for able-bodied individuals, but fails to provide an ADA accessible route to the bar dining area for individuals with disabilities which prohibits individuals with disabilities from the full and

equal opportunity to access the goods and services at the Live Bait restaurant:

    i.  The facility provides an accessible route to the bar dining area for able-bodied individuals but fails to provide an ADA accessible route to the bar dining area for individuals with disabilities which prohibits disabled individuals from being able to have the same dining experiences as individuals without disabilities;

    ii.  The facility provides a path of travel to the bar dining area for able-bodied individuals, but fails to provide an ADA accessible route to the bar dining area for non-able-bodied individuals;

    iii.  Live Bait fails to maintain the accessible features of the accessible route to the bar dining area so that it is readily accessible to and usable by individuals with disabilities;

m)  Live Bait provides stairs to the bar dining area for able-bodied individuals but fails to provide ADA accessible stairs to the bar dining area for non-able-bodied individuals, and therefore

affords individuals with disabilities the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

  i. The handrails serving the stairs fail to extend 12 inches minimum beyond the top and bottom of the stairs;

  ii. Live Bait fails to maintain its stairs to the back entrance so that they are readily accessible to and usable by individuals with disabilities;

n) Live Bait provides a bar for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited the following failures of Defendants:

  i. The top surface of the bar exceeds the maximum allowed height of 34 inches above the finished floor;

ii. The bar counter fails to provide the required knee clearance for an individual with a disability to be afforded the opportunity to sit at the bar;

iii. The bar counter fails to provide the required toe clearance for an individual with a disability to be afforded the opportunity to sit at the bar;

iv. Live Bait's bar fails to provide at least five percent (5%) ADA accessible seating;

v. The bar counter fails to provide the required 30 inches of clear surface for an individual with a disability to be afforded the opportunity to use the bar counter;

vi. Live Bait fails to maintain the accessible features of the bar so that it is readily accessible to and usable by individuals with disabilities;

o) Live Bait provides high-top seating tables for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without

disabilities, which includes but is not limited the following failures of Defendants:

i. The top surface of the high-top seating tables exceeds the maximum allowed height of 34 inches above the finished floor;

ii. The high-top seating tables fails to provide the required knee clearance for an individual with a disability to be afforded the opportunity to sit at the high-top seating tables;

iii. The high-top seating tables fails to provide the required toe clearance for an individual with a disability to be afforded the opportunity to sit at the high-top seating tables;

iv. Live Bait's high-top seating tables fails to provide at least five percent (5%) ADA accessible seating;

v. There is not a 30-inch-wide minimum clear table surface available for an individual with a disability to be afforded the opportunity to approach the table surface;

vi. Live Bait fails to maintain the accessible features of the high-top seating tables so that it is readily accessible to and usable by individuals with disabilities;

p) Live Bait provides booth seating tables for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited the following failures of Defendants:

i. The top surface of the booth seating tables exceeds the maximum allowed height of 34 inches above the finished floor;

ii. The booth seating tables fails to provide the required knee clearance for an individual with a disability to be afforded the opportunity to sit at the booth seating tables;

iii. The booth seating tables fails to provide the required toe clearance for an individual with a disability to be

afforded the opportunity to sit at the booth seating tables;

iv. Live Bait's booth seating tables fails to provide at least five percent (5%) ADA accessible seating;

v. There is not a 30-inch-wide minimum clear table surface available for an individual with a disability to be afforded the opportunity to approach the table surface;

vi. Live Bait fails to maintain the accessible features of the booth seating tables so that it is readily accessible to and usable by individuals with disabilities;

## DINING AREA

q) Live Bait provides seating tables for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited the following failures of Defendants:

i. The top surface of the seating tables exceeds the maximum allowed height of 34 inches above the finished floor;

ii. The seating tables fails to provide the required knee clearance for an individual with a disability to be afforded the opportunity to sit at the seating tables;

iii. The seating tables fails to provide the required toe clearance for an individual with a disability to be afforded the opportunity to sit at the seating tables;

iv. Live Bait's seating tables fails to provide at least five percent (5%) ADA accessible seating;

v. There is not a 30-inch-wide minimum clear table surface available for an individual with a disability to be afforded the opportunity to approach the table surface;

vi. Live Bait fails to maintain the accessible features of the seating tables so that it is readily accessible to and usable by individuals with disabilities;

r) Live Bait provides an accessible route to the elevated seating in the dining area for able-bodied individuals, but fails to provide an ADA accessible route to the elevated seating in the dining area for individuals with disabilities which prohibits individuals with disabilities from the full and equal opportunity to access the goods and services at the Live Bait restaurant:

    i. The facility provides an accessible route to the elevated seating in the dining area for able-bodied individuals but fails to provide an ADA accessible route to the elevated seating in the dining area for individuals with disabilities which prohibits disabled individuals from being able to have the same dining experiences as individuals without disabilities;

    ii. The facility provides a path of travel to the elevated seating in the dining for able-bodied individuals, but fails to provide an ADA accessible route to the elevated seating in the dining area for non-able-bodied individuals;

    **iii.** Live Bait fails to maintain the accessible features of the accessible route so that it is readily accessible to and usable by individuals with disabilities;

## MEN'S RESTROOM

**s)** Live Bait provides an accessible route to the restrooms for able-bodied individuals, but fails to provide an ADA accessible route to the restrooms for individuals with disabilities which prohibits individuals with disabilities from the full and equal opportunity to access the goods and services at the Live Bait restaurant:

    **i.** The facility provides an accessible route to the restrooms for able-bodied individuals but fails to provide an ADA accessible route to the restrooms for individuals with disabilities which prohibits disabled individuals from being able to have the same dining experiences as individuals without disabilities;

    **ii.** The facility provides a path of travel to the restrooms for able-bodied individuals, but fails to provide an ADA accessible route to the restrooms for non-able-bodied individuals;

           iii.  Live Bait fails to maintain the accessible features of the accessible route so that it is readily accessible to and usable by individuals with disabilities;

**t)**  There is signage for able-bodied individuals identifying and designating an area of the store as "restrooms" however there is no signage displaying the international symbol of accessibility identifying restrooms as ADA accessible;

**u)**  Live Bait provides a toilet compartment for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that shopping experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

           i.  The toilet compartment door is not self-closing which is a violation of § 604.8.1.2;

           ii.  The toilet compartment door fails to have door pulls located on both sides which is a violation of § 604.8.1.2.

iii. The toilet compartment door swings into the required maneuvering clearance around the water closet;

iv. The toilet compartment is measured 33.03 inches wide and 32.78 inches deep which fails to meet the required dimensions 60 inches wide by 59 inches deep for a wheel chair user to be able to maneuver in the compartment;

v. Top of the seat on the water closet is measured at 16 which fails to meet the required height of 17 – 19 inches above the finished floor;

vi. The centerline of the water closet exceeds the maximum allowed 18 inches from the side wall;

vii. The flush control valve fails to be located on the open side of the water closet;

viii. The facility fails to provide a side wall grab bar in the toilet compartment;

ix. The facility fails to provide a rear wall grab bar in the toilet compartment;

    **x.** Live Bait fails to maintain the accessible features of the restroom so that it is readily accessible to and usable by individuals with disabilities;

**v)** Live Bait provides a lavatory for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that dining experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendants:

    **i.** The lavatory sink counter top is measured 35.12 inches above the finished floor which exceeds the maximum allowed height of 34 inches above the finished floor;

    **ii.** The lavatory sink does not provide the required knee clearance for a wheelchair user to approach the sink;

    **iii.** The bottom reflecting surface of the mirror is measured 52.71 inches above the finished floor which exceeds the maximum allowed height of 40 inches above the finished floor;

iv. The soap dispenser is measured at 55.71 inches above the finished floor which exceeds the maximum allowed obstructed reach range of 44 inches above the finished floor;

v. The paper towel dispenser is measured at 55.81 inches above the finished floor which exceeds the maximum allowed obstructed reach range of 44 inches above the finished floor;

vi. Live Bait fails to maintain the accessible features of the lavatory so that it is readily accessible to and usable by individuals with disabilities;

21. To date, the barriers to access and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

22. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. §12205.

23. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant Plaintiff's injunctive relief, including an Order to alter the discriminating facility to make it readily accessible to, and useable by, individuals with disabilities to the extent required by the ADA, and closing the facility until the requisite modifications are completed, and to further order the Defendants to modify their policies, practices, and procedures, to provide equal use of their facility, services and benefits to disabled individuals.

**COUNT TWO**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III**
**42 U.S.C. § 12182(b)(2)(A)(ii)**
***(Practices, procedures, and policies denying equal benefits)***

**ADA Title III Prohibits Other Discrimination in Addition to Architectural Barriers**

24. Plaintiff re-alleges paragraphs 1-23 above.

25. The ADA, Title III, provides a private right of action for "any person who is being subjected to discrimination on the basis of disability in violation of" Title III. 42 U.S.C. § 12182(a)(1) (emphasis added).

26. The ADA, Title III, specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to

relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A))(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). In other words, the disabled must receive equal benefits as the nondisabled. Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs and mobility aids have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs and mobility aids historically have been provided "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." See 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

27. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to

make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

28. To address this broad range of discrimination in the context of public accommodations, Congress enacted ADA, Title III, which provides in part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. 12182.

29. By its clear text, ADA, Title III requires a public accommodation to provide individuals with disabilities *more than simple physical access.* Removal of architectural barriers as required by Count One of this Complaint is but one component of compliance with ADA, Title III. Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of

exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

30. For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). The Eleventh Circuit held in Rendon v. Valleycrest Prod., Ltd. 294 F.3d 1279, (11th Cir. 2002) that:

> "A reading of the plain and unambiguous statutory language at issue reveals that the definition of discrimination provided in Title III covers both <u>tangible barriers</u> (emphasis added), that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and <u>intangible barriers</u> (emphasis added), such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the Defendants entity's goods, services and privileges."

## Defendants' Failed Practices and Lack of Policies Are Discriminatory

31. Pursuant to 42 U.S.C. § 12182(b)(2)(A)(ii) discrimination includes:

> "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."

32. Accordingly, a place of public accommodation must modify a policy or practice that has the consequence of, or tends to deny, access to goods or services to the disabled. Similarly, a place of public accommodation must not have a policy or practice that "has a discriminatory effect in practice" of preventing disabled individuals

from realizing the full and equal enjoyment of the goods and services the public accommodation offers to potential customers. *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F.Supp.3d 565 (D. Vt. 2015).

33. As detailed below, Defendants have failed to make reasonable modifications in their policies, practices, and procedures that are necessary to afford their goods, services, facilities, privileges, advantages, or accommodations to individuals with restricted mobility. By failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, Defendants denied services, segregated or otherwise treated Plaintiff differently than other individuals who are not disabled. Pursuant to 42 U.S.C. § 12182(b)(2)(A), Defendants have discriminated against Plaintiff. Defendants will continue that discrimination forever until enjoined as Plaintiff requests. The discrimination is described more particularly in the following paragraphs.

34. Defendants either have no policies, practices, and procedures to remove architectural barriers or else they do not abide by them. The rampant architectural barriers previously identified in Count One establish that Defendants have failed to create, adopt, and/or

implement ADA Title III compliance policies, procedures, and practices as to architectural barriers.

35. Defendants' use of their restaurant, and their practices at the Live Bait restaurant located at 24281 Perdido Beach Blvd, Orange Beach, AL 36561, literally create barriers and in so doing deny Plaintiff the full and equal enjoyment of the restaurant. Those practices include:

    **a)** Defendants' seating arrangement is designed, positioned, and oriented in a way that excludes or otherwise segregates disabled individuals to an experience that is not the same experience that is afforded to able-bodied individuals, because unlike the able-bodied, disabled individuals are forced to sit at one type of table or facing the wall, or are outright excluded from the "opportunity" to sit anywhere else that able-bodied individuals are able to sit and enjoy the Live Bait experience;

    **b)** Defendants' use of their seating arrangement has a discriminatory effect in practice, so that Mr. Dunn is provided a "separate" and "unequal" benefit than the benefits that able-bodied individuals have when dining at Defendants'

restaurant because able-bodied individuals can sit at every type of seating table, whereas Mr. Dunn is entirely prohibited from that same "opportunity" to considering where he wants to sit;

c) Defendants fail to provide ADA accessible parking with connecting accessible routes to the entrance of the restaurant from their parking lot, which means that Mr. Dunn is forced to depend on assistance from a third party to get into the restaurant, whereas non-disabled conveniently access the restaurant from the parking lot without the need of assistance;

d) Defendants make the hostess counter inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means Mr. Dunn cannot fully and equally use the counter to be seated at their table in the way the non-disabled do, because the non-disabled have a counter they can use to be seated at their table;

e) Defendants make the check-out counter in the gift shop inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means Mr. Dunn cannot fully and equally use the counter to check

out in the way the non-disabled do, because the non-disabled have a counter they can use to check out;

f) Defendants use the accessible counter surface as a storage area for items, so that Mr. Dunn does not have a counter surface to use, unlike the able-bodied who do have usable counter surfaces;

g) Defendants fail to provide an accessible route to and throughout the bar dining area, which means that Mr. Dunn cannot travel and move throughout the bar dining area the way non-disabled people can. Accordingly, he cannot fully and equally use the restaurant as the non-disabled can;

h) Defendants fail to provide an accessible route to and throughout the dining area, which means that Mr. Dunn cannot travel and move throughout the dining area the way non-disabled people can. Accordingly, he cannot fully and equally use the restaurant as the non-disabled can;

i) Defendants fail to provide an accessible restroom to Plaintiff and other disabled individuals, so that Mr. Dunn cannot relieve himself or move into and throughout the restroom, which the able-bodied can freely do;

j) Defendants fail to provide signage to the restroom area displaying the International Symbol of Accessibility informing and directing disabled individuals to the ADA accessible restroom, which means that Live Bait does not even claim to have an ADA accessible restroom and that Mr. Dunn has to use trial and error to decide where the restroom is he can use, if he can use it at all, unlike the non-disabled who can freely use the restroom;

k) Defendants' policies, practices, and procedures are conducted without regard to disabled individuals;

36. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have no policies, practices, or procedures, or else they have failed to implement them, to ensure that any removal of architectural barriers is permanent. 42 U.S.C. § 12182(b)(2)(a)(iv) and (v).

37. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants' existing practice is both in effect and/or explicitly to remediate ADA Title III architectural barriers only upon demand by the disabled.

38. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have no policies, practices, and procedures or else they failed to create, implement and maintain policies and procedures to ensure individuals with disabilities are able to have the same experience at their restaurant as individuals without disabilities, 42 U.S.C. 12182(b)(1)(A), and in particular the opportunity to have full and equal access to all of the goods, services, privileges, advantages, or accommodations of the Live Bait restaurant, as described above in detail.

39. As the continuing architectural barriers and the failure to provide full and equal use of the facility establishes, Defendants have failed to create, implement, and maintain a policy of complying with ADA building design standards and regulations.

40. To date, the Defendants' discriminating policies, practices, and/or procedures have not been reasonably modified to afford goods, services, facilities, privileges, advantages, or other accommodations to individuals with disabilities.

41. A reasonable modification in the policies, practices, and procedures described above will not fundamentally alter the nature of such goods, services, facilities, privileges, advantages, and accommodations. The Plaintiff hereby demands that Defendants both create and adopt a corporate practice and policy that Defendants (1) will fully comply with Title III, ADA, and all its implementing regulations so that architectural barriers identified above are permanently removed from Defendants' restaurant consistent with the ADA; (2) Defendants will provide the disabled, including those with mobility limitations full and equal use and enjoyment of the Live Bait restaurant; (3) Defendants will modify their practice of making ADA Title III architectural barrier remediations only upon demand by the disabled.

42. As pled above, GT Properties, L.L.C. "owns" and "leases to" Live Bait, L.L.C. the real property and its improvements in which the Live Bait establishment is located, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintain policies, practices and procedures, as alleged above.

43. As pled above, Live Bait, L.L.C. "operates" and "leases" the Live Bait restaurant located at 24281 Perdido Beach Blvd, Orange Beach, AL 36561, and is therefore, pursuant to 42 U.S.C. § 12182, responsible for creating, implementing, and maintaining policies, practices and procedures, as alleged above.

44. The ADA is over twenty-five (25) years old. Defendants knows it must comply with the ADA Title III. The ADA Title III requires modifications in policies, practices, and procedures to comply with it, as pled above in the statute. 42 U.S.C. §12182(b)(2)(A)(ii).

45. By this Complaint, Plaintiff provides sufficient notice of his demands for an alteration in Defendants' policies, practices, and procedures.

46. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

47. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal policies, practices, and procedures.

## COUNT THREE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### *Denial of Full and Equal Enjoyment*

**48.** Plaintiff re-alleges paragraphs 1-47 above.

**49.** 42 U.S.C. § 12182(a) provides:

> *"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."*

**50.** Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

**51.** Congress also found that: *"individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities,* 42 U.S.C. §

12101(a)(5); *"the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;"* 42 U.S.C. § 12101(a)(7). Congress even found that: *"the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."* 42 U.S.C. § 12101(a)(8).

52. In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressed discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

53. The ADA provides, inter alia, that it is discriminatory to subject an individual or class of individuals on the basis of a disability "to a denial of the opportunity of the individual or class to participate in

or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a)(i).

54. The ADA further provides that it is discriminatory "to afford an individual or class of individuals, on the basis of a disability ... with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(a)(ii).

55. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5). Defendants' acts and omissions alleged herein are in violation of the ADA, 42 U.S.C. §§ 12101, et seq., and the regulations promulgated thereunder.

56. To address this *broad* range of discrimination in the context of public accommodations, Congress enacted Title III, which by its clear text, requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter *various forms of discrimination*" including not only barriers to physical access, but also other forms of exclusion and *relegation to lesser services, programs, activities, benefits, jobs, or other opportunities*. 42 U.S.C. 12101(a)(5); see also H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35-36 (1990) ("lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation.").

57. For that reason, the Act applies not only to barriers to physical access to business locations, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' *full and equal enjoyment* of the privileges and *services* offered by the public

accommodation to the public. 42 U.S.C. 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(1)(A)(i).

58. The keystone for this analysis is Defendants *must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience. Spector v. Norwegian Cruise Line Ltd.,* 545 U.S. 119, 128–29, 125 S.Ct. 2169, 162 L . E d . 2d 97 (2005) See also, *Baughman v. Walt Disney World Company*, 685 F.3D 1131, 1135 (9th Cir. 2012).

59. Plaintiff, Patrick Dunn, was denied full and equal access to the Live Bait restaurant. Plaintiff specifically and definitely wants to return to the Defendants' restaurant to enjoy the seafood, steaks, po'boys, among other coastal food choices, which includes adult beverages at the tiki deck and live music and entertainment in the night club. More specifically, Plaintiff wants to be afforded the same level of service that is offered to non-disabled individuals and which Defendants have failed to provide to Plaintiff as follows: Defendants failed to provide an accessible route to and throughout

the dining seating area and bar seating area for disabled individuals, which means that unlike the non-disabled, the disabled must struggle to move throughout the dining seating area and bar seating area, if they can make it at all; Defendants failed to provide an accessible route to and throughout the restrooms for disabled individuals, which means that unlike the non-disabled, the disabled must struggle just to get into and out of the restrooms independently, if they can make it at all; Defendants failed to provide an accessible restroom that is readily accessible to and usable by Plaintiff and other disabled individuals; Defendants failed to provide Plaintiff that same experience that non-disabled individuals have when dining at Live Bait; Defendants failed to provide the same experience by making it nearly impossible for the disabled to access the hostess counter in the restaurant and the check-out counter in the gift shop, while the non-disabled can independently access these counters and services provided at those counters; Defendants failed to provide the same experience by failing to provide seating tables for the disabled to dine in the dining seating area, to dine in the bar seating area, while the non-disabled can fully use the seating tables; Defendants failed to maintain the

accessible signage of the Live Bait restaurant so that the disabled, unlike the non-disabled, do not even know what route and what paths of travel are usable by individuals with disabilities; Defendants' failure to identify by signage what is accessible and what is not accessible makes the disabled inferior, segregated or otherwise treated differently, because unlike the non-disabled, disabled individuals have to guess and speculate and determine by trial and error what facilities can even be used by them; Defendants' use of the accessible counter surface as a storage area for items denies the disabled a counter surface to use, unlike the able-bodied, who have usable counter surfaces; and all the foregoing failures by Defendants inhibited Plaintiff from having the same experience that non-disabled individuals have when dining at the Live Bait restaurant.

60. In its Preamble to the title III regulation, the Department of Justice recognized that mobility impaired persons including persons in wheelchairs should have the same opportunities to enjoy the goods and services and other similar events of public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated

accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

61.  The ADA specifically makes it unlawful to provide individuals with disabilities with an "unequal benefit," and to relegate individuals with disabilities to a "different or separate" benefit. 42 U.S.C. §§ 12182(b)(1)(A))(ii)-(iii); 28 C.F.R. § 36.202(b)-(c). Further, 28 C.F.R. § 302(b) require that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs historically have been provided "inferior seating" and "segregated accommodations" compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." See 28 C.F.R. pt. 36, App. B, at 631-633, 651 (2000) (discussion of §§ 36.308, 36.203).

62.  Thus, Defendants' "use" of the accessible features constitutes statutory discrimination in violation of the ADA, because

Defendants have segregated and separated the disabled from the non- disabled individuals. "*The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected.*" H.R. Rep. No. 101-485(III), at 50, 1990 U.S.C.C.A.N at 473. The ADA provides a "broad mandate" to "eliminate discrimination against disabled individuals, and to integrate those individuals into the economic and social mainstream American life. <u>PGA Tour, Inc. v. Martin</u>, 532 U.S. 661, 675, 121 S.Ct.1879, 149 L.Ed.2d 904 (2001) (*quoting H.R.Rep. No. 101-485, pt. 2, p.50 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 332*).

63. Defendants discriminated against Plaintiff by denying Plaintiff "full and equal enjoyment" and use of the goods, services, facilities, privileges and accommodations of the facility during each visit. Each incident of deterrence denied Plaintiff an equal "opportunity to participate in or benefit from the goods, services, facility, privilege, advantage, or accommodations" of Live Bait.

64. Defendants' conduct and Defendants' unequal treatment to Plaintiff constitutes continuous violations of the ADA and absent a Court ordered injunction from doing so, Defendants will continue to treat

Plaintiff and others similarly situated unequally to the status of a second-class citizen.

65. Defendants' failure to maintain the accessible features that are required to be readily accessible to and usable by individuals with disabilities constitute continuous discrimination and absent a Court ordered injunction, Defendants will continue to not maintain the required accessible features at Defendants' facility. 28 C.F.R.§ 36.211(a).

66. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

67. Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal acts of Defendants.

## COUNT FOUR
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
### 42 U.S.C. § 12183(a)(1)
#### (Failure to design and construct facility for ADA compliance)

**68.** Plaintiff re-alleges paragraphs 1 – 67 above.

**69.** 42 U.S.C. § 12183(a)(1) provides:

> *[Discrimination includes] a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter.*

**70.** Congress passed the ADA in part because "historically, society has tended to isolate and segregate individuals with disabilities, and such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress found that this discrimination included "segregation and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." Id. § 12101(a)(5). In its Preamble to the title III regulation, the Department of Justice recognized that persons in wheelchairs should have the same opportunities to enjoy the goods

and services and other similar events of a public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of *second-class citizens*. 28 C.F.R. pt. 36, App. B, § 36.203.

71. To eliminate such segregation Congress enacted the requirement that facilities be "readily accessible to and usable by individuals with disabilities". This very requirement is intended to enable persons with disabilities *"to get to, enter and use a facility."* H.R. Rep. No. 101-485(III), at 499-500 (1990). It requires "a high degree of convenient accessibility," id., as well as access to the same services that are provided to members of the general public. "For new construction and alterations, the purpose is *to ensure that the service offered to persons with disabilities is equal to the service offered to others.*" Id.

72. As the legislative history makes clear, the ADA is geared to the future-- the goal being that, over time, access will be the rule rather than the exception. Thus, the ADA only requires modest expenditures to provide access in existing facilities, *while requiring*

*all new construction to be accessible.* H.R. Rep. 485, Part 3, 101st Cong., 2d Sess. 63 (1990).

73. To realize its goal of a fully accessible future, Congress required that all newly constructed facilities be designed and constructed according to architectural standards set by the Attorney General. 42 U.S.C. §§ 12183(a), 12186(b). Those Standards for Accessible Design ("Standards") are incorporated into the Department of Justice's regulation implementing title III of the ADA, 28 C.F.R. Part 36, Appendix A. The Standards set architectural requirements for newly constructed buildings that apply to all areas of the facility, from parking areas, interior walkways and entrances, common areas, interior stairways and elevators, restrooms, dressing rooms and sales/service areas.

74. Defendant, GT Properties, L.L.C., "owns" and "leases to" Live Bait, L.L.C. the real property and its improvements in which the Live Bait establishment is located, and is directly involved in the designing and/or construction of the restaurant in this litigation for first occupancy after January 1993.

75.   Defendant, Live Bait, L.L.C. "operates" and "leases" the Live Bait restaurant, and at all relevant times was and is directly involved in the designing and/or construction of the restaurant in this litigation for first occupancy after January 1993.

76.   Defendants were and are required to design and construct the Live Bait restaurant to be "readily accessible to and usable by individuals with disabilities." Defendants violated the statute by failing to design and construct *their restaurant to be* readily accessible to and usable by individuals with disabilities including individuals who use wheelchairs. Defendants further violated the statute by failing to design and construct their restaurant in compliance with the ADA during planned alterations as described throughout this Complaint.

77.   According to Defendants' own publicly available information, Defendants chose to design their restaurant in a way that is not ADA Title III compliant whatsoever. Defendants literally strategically design, construct and maintain their restaurant without any regard to the disabled. Defendants' systematic design of their restaurant fails to afford disabled individuals the same shopping experience that is afforded to individuals without disabilities.

78. To date, the Defendants' discriminating actions continue.

79. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendants pursuant to 42 U.S.C. § 12205.

80. Pursuant to 42 U.S.C. § 12188 this Court is authorized to enjoin these illegal actions by Defendants.

**WHEREFORE**, premises considered, Patrick Dunn demands judgment against the Defendants on Counts One through Four and requests the following injunctive and declaratory relief:

1. That the Court declare that the property owned and business operated by the Defendants as well as all Defendants' illegal actions described herein violate the Americans with Disabilities Act, as more particularly described above;

2. That the Court enter an order enjoining the Defendants to alter the facility to make it accessible to and usable by individuals with disabilities to the full extent required by Title III of the ADA, to comply with 42 U.S.C. § 12182(b)(2)(A)(iv) and its implementing regulations, as stated in Count One;

3.  That the Court enter an order, in accordance with Count Two, directing the Defendants to modify their policies, practices, and procedures both to remedy the numerous ADA violations outlined above, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii), and to permanently enjoin Defendants to make their business practices consistent with ADA Title III in the future;

4.  That the Court enter an order directing the Defendants to provide Plaintiff full and equal access both to the Live Bait dining experience and to the use of the Live Bait facility, and further order Defendants to maintain the required accessible features at the restaurant so that Plaintiff and others similarly situated are offered the experience that is offered to non-disabled individuals, as stated in Count Three;

5.  That the Court enter an Order directing the Defendants to evaluate and neutralize their policies, practices, and procedures towards persons with disabilities for such reasonable time so as to allow them to undertake and complete corrective procedures;

6.  That the Court enjoin Defendants to remediate the Live Bait restaurant to the proper level of accessibility required for the design

and construction of the facility for first occupancy, as stated in Count Four;

7. That the Court award reasonable attorney's fees, costs, (including expert fees) and other expenses of suit, to Plaintiff; and

8. That the Court award such other, further, and different relief as it deems necessary, just, and proper.

Respectfully Submitted, this the 21st Day of July, 2017.

/s/ Cassie E. Taylor

**CASSIE E. TAYLOR**
**BPR # AL-8297N67R**
The ADA Group LLC
4001 Carmichael Road, Suite 570
P.O. Box 6429 (36106)
Montgomery, AL 36106
334.819.4030 p
334.819.4032 f
CET@ADA-Firm.com
*Attorney for the Plaintiff*

/s/

**L. LANDIS SEXTON**
**BPR # AL-5057N71L**
The ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.819.4032 f
LLS@ADA-Firm.com
*Attorney for the Plaintiff*

/s/

**Tracy G. BirdSong**
**BPR # AL-2170D64T**
The ADA Group LLC
4001 Carmichael Road, Suite 570
Montgomery, Alabama 36106
334.819.4030 p
334.819.4032 f
TGB@ADA-Firm.com
*Attorney for the Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that I have this day filed with the Clerk of Court the aforementioned Complaint for service of process by USPS mail or electronic mail, postage prepaid and properly addressed this ___21st___ day of July, 2017 to the following:

**GT PROPERTIES, L.L.C.**
attn.: Registered Agent
2868 Acton Road, Suite 204
Birmingham, AL 35243

**LIVE BAIT, L.L.C.**
attn.: Registered Agent
2868 Acton Road, Suite 204
Birmingham, AL 35243

/s/ _Cassie E. Taylor_
**CASSIE E. TAYLOR**
**BPR # AL-8297N67R**
The ADA Group LLC
4001 Carmichael Road, Suite 570
P.O. Box 6429 (36106)
Montgomery, AL 36106
334.819.4030 p
334.819.4032 f
CET@ADA-Firm.com
*Attorney for the Plaintiff*